UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| BARRETT PAVING MATERIALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 04-61-B-S |
| | ) | |
| CONTINENTAL INSURANCE COMPANY, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**RECOMMENDED DECISION ON MOTIONS FOR SUMMARY JUDGMENT
FILED BY BARRETT PAVING MATERIALS, CONTINENTAL INSURANCE
COMPANY, FIRST STATE INSURANCE COMPANY AND MICHIGAN MUTUAL
INSURANCE COMPANY**

This Recommended Decision addresses four motions for summary judgment in this declaratory judgment and breach of contract action filed by Barrett Paving Materials against the named insurance companies. Barrett seeks with this action to impose on the defendant insurance companies a duty to defend Barrett in relation to an underlying third-party CERCLA action brought against Barrett by Citizens Communications Company, in which it was alleged, among other things, that Barrett has contributory liability to Citizens based on one or more negligent acts of pollution. The core issue of the pending dispute is whether the general allegations set forth in Citizens's underlying complaint excluded the possibility that liability might be imposed on Barrett based on a "sudden and accidental" discharge of pollution, thereby precluding coverage under the defendants' policies. Based on my analysis of this question and certain ancillary questions raised in the motions for summary judgment, I recommend that the Court deny the motions for summary judgment filed by Continental Insurance Company and Michigan

Mutual Insurance Company (both primary liability insurers), grant the motion for summary judgment filed by First State Insurance Company (the umbrella insurer) and grant, in part, the motion filed by Barrett Paving Materials.

### FACTS

The following statement of facts is drawn in part from a joint stipulation filed by all of the parties and in part from a Local Rule 56 statement of material facts filed by Barrett and never opposed by any of the defendants.  Because all of the facts are established by stipulation and by the defendants' failure to object to Barrett's additional statements of material fact, see D. Me. Loc. R. 56(f), there are no genuine issues of material fact to prevent judgment from entering on the basis of the pending motions.

### A.      The Underlying Complaint

On November 22, 2002, the City of Bangor filed suit against Citizens Communication Company seeking, among other relief, a judgment ordering Citizens to pay all, or an equitable portion of, the costs incurred by the City in association with its ongoing, voluntary investigation, corrective action and other response actions to remediate a tar slick on the bottom of the Penobscot River in the vicinity of certain operations historically undertaken by Citizens and other entities, including Barrett Paving.  In due course, Citizens filed a third-party complaint against Barrett, among others, in which Citizens alleged that Barrett was liable to contribute toward or indemnify Citizens's liability to Bangor, if any, on the following general allegations:

> 11.      The tar and asphalt plant in Bangor, Maine, presently owned by Barrett . . . has been in operation since approximately 1937 and continues to operate at the present time.

> 12.      Barrett . . . acquired the Barrett Plant in or about 1979.

> 13.      The Barrett Plant . . . has received, produced, stored and/or distributed tar and asphalt for road paving and other purposes.

2

\* \* \* \*

15.     On one or more occasions since Barrett . . . has owned and operated the Barrett Plant, asphalt materials containing poly-aromatic hydrocarbons, also know as PAHs, were released from the Barrett Plant into the Penobscot River.

16.     Upon information and belief, the soil at the Barrett Plant is contaminated with substances that contain PAHs.

17.     Sewers historically located in or near the Barrett Plant drained, directly and without treatment, into the Penobscot River.

18.     Tidal action of the Penobscot River causes contamination from the Barrett Plant to be flushed into the river.

19.     Upon information and belief, hazardous substances and hazardous wastes from the Allied Plant were released into the Penobscot through sewers, overland flow of water and/or tidal action.

\* \* \* \*

## COUNT I — CERCLA CONTRIBUTION

\* \* \* \*

25.     Upon information and belief, releases of hazardous materials into the Penobscot have occurred on one or more occasions at the Barrett Plant.

\* \* \* \*

28.     As a responsible party [for contamination of the Penobscot], Barrett . . . is liable for an equitable share of response costs related to the Penobscot River.

\* \* \* \*

## COUNT III — COMMON LAW CONTRIBUTION

36.     To the extent Citizens is found liable in tort to the City or to any other third party for harm caused by hazardous substances or other materials in the Penobscot River that originated at the Barrett Plant, Barrett . . . is jointly liable for such harm.

\* \* \* \*

3

COUNT V — NEGLIGENCE

44.     Barrett . . . breached its duty of care by causing and/or permitting
one or more releases of hazardous substances or other materials from the Barrett
Plant.

(Joint Stip. ¶ 9, Docket No. 51; Third Party Compl. Against Barrett Paving Materials, Docket

No. 1:02-cv-183-B-S, Docket No. 17.[1])

## B.      Additional Facts Generated by Stipulation

In 1979, Barrett Paving purchased certain assets from Allied Chemical, which included a

waterfront storage facility located on the banks of the Penobscot River in Bangor, Maine.  At its

Bangor, Maine location, Barrett Paving stored liquefied asphalt, which  it sold to local

governments and businesses for use in conjunction with road construction.  The liquid asphalt

was not manufactured on the site.  Rather, the liquid asphalt was delivered by barges to Barrett

Paving's waterfront storage facility in Bangor, Maine.  (Joint Stip. ¶¶ 3-5.)

In response to discovery requests propounded by Continental, Barrett answered the

following interrogatory in the following manner:

**Interrogatory No. 7**
If you contend that any spill, release, dispersal or discharge of any pollutant or
contaminant took place at the Site, please identify the particular circumstances of
each such spill, release, dispersal or discharge.

**Answer No. 7**
On July 21, 1988, hot asphalt spilled from a barge into the Penobscot River while
the barge was being unloaded. The asphalt, which hardened as it entered the
River, was fully recovered.

(Id. ¶ 24.)  Similarly, Roland Fogg, Barrett 's plant manager in Bangor, testified as a 30(b)(6)

designee as follows:

Q.  Are you aware of any sudden and/or accidental discharge of any

---

[1]     The Joint Stipulation reproduces only paragraphs 15-19 of the underlying complaint.  I take notice of the
entire underlying complaint.

pollutants from the Barrett Paving Plant into the Penobscot River?
A.  None that I'm aware of.
Q.  At any time?
A   Other than the July 21 '88, that is the only discharge that I am
aware of.

(Id. ¶ 24.)

## C.    Continental Insurance Company's Policy (Joint Stip. ¶¶ 23, 29-31)

Barrett Paving initially obtained primary liability insurance coverage from Midland

Insurance Company.  That primary insurance was in effect from approximately December 14,

1979,to February 15, 1980.  On or around February 15, 1980, Continental issued a primary

liability insurance policy to Barrett Paving (Policy No. SRL3635963), thereby replacing the

Midland primary policy.  In regard to Continental's primary comprehensive general liability

(CGL) Policy No. SRL 363 59 63, Barrett Paving paid a total premium of approximately

$195,500.00.  It is undisputed that Continental insured Barrett under at least three polices issued

in the early 1980s.  Continental does not contest that the language of the coverage provisions of

those policies would extend to the kinds of potential liability generated by Citizens's third-party

action.  However, Continental maintains that Citizens's allegations "clearly seek recovery for

discharges into the Penobscot River that occurred over a period of decades" and, therefore,

coverage is conclusively precluded by one of the policies' exclusionary provisions.

(Continental's Mot. at 2, Docket No. 49.)  It is undisputed that each Continental policy issued to

Barrett contained the following exclusion from coverage:

> (f) bodily injury or property damage arising out of the discharge, dispersal,
> release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic materials,
> liquids or gases, waste materials or other irritants, contaminants or pollutants into
> or upon land, the atmosphere or any water course or body of water; but this
> exclusion does not apply if such discharge, dispersal, release or escape is sudden
> and accidental.

(Joint Stip. ¶ 23.)

**D.      Michigan Mutual Insurance Company's Policy**

Michigan Mutual concedes that between 1982 and December 31, 1985, it used policy forms for commercial liability coverage that extended coverage for "all sums which the insured shall become legally obligated to pay as damages because of . . . property damage . . . to which this policy applies, caused by an occurrence."  (Michigan Mutual's Mot. at 3, Docket No. 54.) The parties have stipulated that prior to January 1, 1986, Michigan Mutual used the CGL policy form attached to their joint stipulation as exhibit W.  (Joint Stip. ¶ 54.)  Michigan Mutual asserts, and Barrett appears willing to concede, that any policies issued to Barrett pre-1986 would have contained an exclusion for liability arising from pollution except for any "discharge, dispersal, release or escape [that] is sudden and accidental."[2]  (Michigan Mutual's Mot. at 3; Barrett's Mot. at 16-17, Docket No. 53; see also Joint Stip. ¶ 54, Ex. W, Exclusion (f).)  The question is whether there is a genuine issue of material fact whether Michigan Mutual actually issued such a policy to Barrett.

Barrett asserts through the affidavit of Anthony Martino, II, its assistant secretary: "According to the available business records of Barrett . . ., Michigan Mutual . . . provided general liability coverage for Barrett . . . from April 1, 1983 to April 1, 1988 pursuant to policy number SR-32-0-72010-2."  (Pl.'s Statement of Fact ¶ 1, Docket No. 52.)  Subsequently, in slightly different words, Barrett asserts: "As noted in Anthony L. Martino's letter of August 7, 2003, Michigan Mutual provided general liability coverage to Barrett Paving for the period from April 1, 1983 to April 1, 1988 pursuant to policy number SR-32-0-72010-2."  (Id. ¶ 6.)  Barrett's

---

[2]      The parties have stipulated that after January 1, 1986, Michigan Mutual used a comprehensive general liability policy form that contained a "total" or "absolute" pollution exclusion.  (Joint Stip. ¶ 55.)  Michigan Mutual asserts that it is entitled to judgment that any policy issued to Barrett after January 1, 1986, would not entitle Barrett to either a defense or indemnification.  (Michigan Mutual's Mot. at 10.)  Barrett takes the position that it disputes this assertion based on Michigan Mutual's failure to ever produce any of Barrett's policies (Barrett's Response to Michigan Mutual's Mot. at 8), but it has stipulated to the fact that after January 1, 1986, the policy would have been in the form that contained the total pollution exclusion (Joint Stip. ¶ 55, citing Ex. X) and it has failed to raise an argument that the language of the total pollution exclusion would not preclude a duty to defend.

"available business records" do not include a copy of any actual policy issued by Michigan Mutual and Michigan Mutual asserts that it does not have records of any policies issued to Barrett in the 1980s. However, following some correspondence and document productions from Barrett, Michigan Mutual acknowledged that it had "issued some policies to Barrett Paving Materials in the 1980s." (Pl.'s Statement ¶ 15.) In addition, Michigan Mutual indicated that any policy it would have issued in the 1980s would have been patterned on basic ISO coverage forms in general use at the time.[3] (Id. ¶ 16; see also Joint Stip. ¶ 14.)

In any event, Barrett asserts in its statement of material facts that Michigan Mutual issued a general liability policy of insurance to Barrett between 1983 and December 31, 1985, as well as beyond that date. Michigan Mutual neglected to file an opposing statement of material fact as called for by Local Rule 56(c). Accordingly, it is deemed admitted that Michigan Mutual issued a general liability policy to Barrett during that timeframe. The terms of that policy are established by Michigan Mutual's own assertion related to its use of standard forms containing the relevant policy language described above, including its stipulation that it used the CGL policy form attached to the parties' joint stipulation as exhibit W.

**E.     First State Insurance Company's Policy** (Joint Stip. ¶¶ 32-53)

First State Insurance Company (hereinafter "First State") issued three excess umbrella liability insurance policies to Barrett Paving. On or around December 14, 1979, First State issued excess umbrella liability Policy No. 943741. First State's Policy No. 943741 was a first layer excess policy and was in effect from December 14, 1979, to February 15, 1981. As a first

---

[3]        The letter exhibit on which Barrett bases this statement of fact reads as follows:

[I]f and when you are able to locate and forward a copy of a policy, it *would contain a pollution exclusion* that would apply to the loss at issue. I can make this statement because I am familiar with the basic ISO coverage forms that would have been in general usage at the time.

(Docket No. 52, Ex. H (emphasis supplied).)

layer excess policy, Policy No. 943741 was excess over the underlying primary liability insurance policy issued by Midland to Barrett Paving from approximately December 14, 1979, to February 15, 1980, and thereafter it was excess over the underlying primary policy issued by Continental.  The limits of liability under First State's excess Policy No. 943741 are $2,000,000, which is in excess of the $1,000,000 limits of liability under the Midland primary insurance policy and the $1,000,000 limits under the Continental primary insurance policy.  In regard to First State's excess liability Policy No. 943741, Barrett Paving paid a total premium of $35,190.00.

On or around February 26, 1980, First State issued a second excess umbrella liability insurance policy (Policy No. 928333) to Barrett Paving.  First State's excess Policy No. 928333 was in effect from February 26, 1980, to February 15, 1981.  In regard to First State's excess liability Policy No. 928333, Barrett Paving paid a total premium of $9,700.00.  Policy No. 928333 was a third layer excess policy, which was excess not only to First State's first layer excess policy (Policy No. 943741), but also to a second layer excess policy issued to Barrett Paving by Transit Casualty Company (hereinafter "Transit") (Policy No. SCU955345).  In consideration for the coverage afforded under Transit's second layer excess Policy No. SCU955345, Barrett Paving paid a total premium of $20,000.00.  The total limit of First State's liability, under the terms and conditions set forth in Policy No. 928333, was $10,000,000, which was in excess of the $11,000,000 limits of liability afforded under the Midland primary insurance policy, the first layer excess Policy No. 943741 issued by First State, and the second layer excess Policy No. SCU955345 issued by Transit.

On or around April 1, 1988, First State issued a third excess umbrella liability insurance policy (Policy No. EU006684) to Barrett Paving.  First State's excess Policy No. EU006684 was

in effect from April 1, 1988, to April 1, 1989.  In regard to First State's excess liability Policy No. EU006684, Barrett Paving paid a total premium of $16,750.00.

Midland is now insolvent.  Barrett Paving does not possess a copy of the primary insurance policy issued by Midland, and it has no knowledge of the terms and conditions of the primary insurance policy issued by Midland.  The primary insurance policy issued to Barrett Paving by Midland has not been exhausted as a result of claims paid on behalf of Barrett Paving.

On or about July 16, 2003, Anthony L. Martino tendered to First State the defense of the third party action brought by Citizens.  On July 18, 2003, First State acknowledged receipt of notification of the third party complaint filed by Citizens.  Anthony L. Martino received a letter dated July 24, 2003, from David Thomas of The Hartford, who is handling Barrett Paving's environmental claims for First State, indicating that The Hartford was in the process of searching for the policies issued to Barrett Paving.  Anthony L. Martino received an additional letter dated November 10, 2003, from David Thomas of The Hartford, denying coverage for the claim.

## DISCUSSION

"The role of summary judgment is to look behind the facade of the pleadings and assay the parties' proof in order to determine whether a trial is required."  Plumley v. S. Container, Inc., 303 F.3d 364, 368 (1st Cir. 2002).  A party moving for summary judgment is entitled to judgment in its favor only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is material if its resolution would "affect the outcome of the suit under the governing law," and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986).  In reviewing the record for a genuine issue of material fact, the Court must view the

summary judgment facts in the light most favorable to the nonmoving party and credit all

favorable inferences that might reasonably be drawn from the facts without resort to speculation.

Merchants Ins. Co. v. United States Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998).  If such facts

and inferences could support a favorable verdict for the nonmoving party, then there is a trial-

worthy controversy and summary judgment must be denied.  ATC Realty, LLC v. Town of

Kingston, 303 F.3d 91, 94 (1st Cir. 2002).

**A.      Continental 's Duty to Defend**

Barrett and Continental are in agreement that Maine law determines Continental's duty to

defend.  Both cite exclusively Maine precedent in support of their statements of the governing

legal standard.  (Continental's Mot. at 4; Barrett's Mot. at 4-6.)  Pursuant to Maine common law,

it is a question of law whether an insurer owes its insured a duty to defend.  Bucci v. Essex Ins.

Co., 393 F.3d 285, 290 (1st Cir. 2005).  "Maine resolves the question of 'whether there exists a

duty to defend . . . by comparing the [underlying] complaint with the terms of the insurance

contract.'"  Id. (quoting Elliott v. Hanover Ins. Co., 711 A.2d 1310, 1312 (Me. 1998)).  For the

duty to defend to exist, the allegations of the underlying complaint must raise a "potential for

liability within the coverage and contain[] no allegations of fact which would necessarily exclude

coverage."  Travelers Indem. Co. v. Dingwell, 414 A.2d 220, 227 (1980).  "This is the case even

when the undisputed facts show the injury in question was not covered by the policy."  Bucci,

393 F.3d at 290.

> Under this comparison test, the insurer has a duty to defend if the underlying
> complaint discloses a "potential or a possibility" for liability within the
> policy's coverage.  Significantly, the duty to defend is broader than the duty to
> indemnify, and an insurer may have to defend before it is clear whether there is a
> duty to indemnify.  Maine requires that insurance policies be interpreted most

strongly against the insurer.  Any ambiguity must be resolved in favor of a duty to defend.

Id. (some internal quotation marks omitted) (citing and quoting Elliott, 711 A.2d at 1312; Commercial Union Ins. Co. v. Royal Ins. Co., 658 A.2d 1081, 1083 (Me. 1995); Mass. Bay Ins. Co. v. Ferraiolo Constr. Co., 584 A.2d 608, 609 (Me. 1990); and Baybutt Constr. Corp. v. Commercial Union Ins. Co., 455 A.2d 914, 921 (Me. 1983), overruled on other grounds, Peerless Ins. Co. v. Brennon, 564 A.2d 383 (Me. 1989)).

According to Continental, it is entitled to summary judgment because "there is not even the barest suggestion [in Citizens's third-party complaint] that Barrett . . . was responsible for any 'sudden and accidental' discharge of pollutants that might trigger the exception to this exclusion." (Continental's Mot. at 4.)  According to Barrett, however, that point is moot because the question is whether a legal or factual basis might arise at trial that would obligate Continental to afford coverage.  (Barrett's Opp'n Mem. at 5, Docket No. 59.)  But, says Continental, Barrett's deposition testimony and interrogatory answers assert that there were no accidental or sudden releases during the relevant timeframe.  (Continental's Mot. at 10.)  So what, rejoins Barrett, an insured is not to be forced to try the underlying action against its insurer or to confess liability in order to obtain a defense, the only question is whether the underlying complaint "excludes the potential that the alleged discharge of pollutants . . . was sudden and accidental," which it does not.  (Barrett's Opp'n Mem. at 9.)  I agree with Barrett.  The underlying complaint's general allegations did not foreclose the potential that Barrett could have liability to Citizens on the basis of any sudden and accidental discharge of pollutants that might be proved by Citizens.  That legal conclusion is virtually compelled by the Law Court's opinion in Travelers Indemnity Company v. Dingwell, 414 A.2d 220 (Me. 1980).

In Dingwell, the Law Court considered whether a class action lawsuit by residents of Gray over well water contamination triggered a duty to defend the operator of an industrial waste facility under certain insurance policies, two of which contained the same general pollution exclusion and "sudden and accidental" exception found in Continental's insurance policy. 414 A.2d at 223. The Court found that a duty to defend arose from these policies, id., because the comparison test must focus exclusively on the allegations of the underlying complaint and, although certain counts alleged intentional acts, id. at 224, and the harm complained of allegedly arose from "the gradual permeation of the ground," id., the more general allegations of "negligence" reflected that the plaintiffs had "no way of knowing" whether the pollution at issue arose from "unintentional spills, leaks, or other accidents," id. at 224-25. Thus, in the Court's view, "[t]he behavior of the pollutants in the environment, after release, is irrelevant" to the language of the pollution exclusion and its sudden and accidental exception. Id. at 225. The Court rejected arguments, which have been repeated here, that a duty to defend could not arise unless the underlying complaint specifically alleged a sudden and accidental release. Id. at 225-26. The Court observed that a complainant need only give notice of his or her claim and that a defendant seeking a defense from an insurer is entitled to a defense even if the underlying complaint "is legally insufficient to withstand a motion to dismiss," so long as "it shows an intent to state a claim within the insurance coverage." Id. at 226. The circumstances in Dingwell are not readily distinguishable from those presented in the case at bar and the Law Court's holding therein is, accordingly, binding on this dispute.[4]

---

[4]      The Law Court also rejected another argument repeated in this case to the effect that the Court should engage in a burden-shifting, evidentiary analysis of the underlying facts. The Law Court flatly rejected this approach, reiterating the holding of a prior opinion wherein the Court concluded that "the most logical rule is the one which predicates the duty to defend solely on the allegation in the complaint, even when the insurer has knowledge of facts to the contrary." Dingwell, 414 A.2d at 227 (quoting Am. Policyholders' Ins. Co. v. Cumberland Cold Storage, 373 A.2d 247, 250 (Me. 1977)).

Continental argues that this case should be determined the way the First Circuit resolved the duty to defend question in A. Johnson & Co v. Aetna Casualty & Surety Co., 933 F.2d 66 (1st Cir. 1991).  (Continental's Mot. at 5-7.)  That case addressed the duty of an insurer to defend and indemnify the plaintiff in connection with a Maine DEP action to remediate a hazardous waste site that was used by the plaintiff and others as a dumping ground for roughly 13 years. Id. at 67.  The First Circuit concluded that these circumstances precluded a duty to defend or indemnify, based on pollution exclusion language like that found in this case, because it was clear from the underlying administrative action that the discharges at the site could not be accidental.  Id. at 70-71.  Thus, the First Circuit observed that "the PRP letters contained factual details which were totally inconsistent with any view that the pollution at the McKin site was 'sudden and accidental.'"  Id. at 72.  Because the appropriate analysis directs the Court to the allegations set forth in the underlying third-party complaint, I conclude that the proper resolution of this dispute is controlled, indeed compelled, by the Law Court's holding in Dingwell.[5] Because there is no genuine issue of material fact and Barrett is entitled to judgment as a matter of law regarding Continental's duty to defend, I recommend that the Court deny Continental's motion for summary judgment and grant, in part, Barrett's motion for summary judgment.

**B.      Michigan Mutual's Duty to Defend**

It is sometimes said that a party attempting to prove the terms of a lost insurance policy must do so with clear and convincing evidence.  There is some question, however, whether this heightened standard is justified in reason.  See, e.g., Remington Arms Co. v. Liberty Mut. Ins. Co., 810 F. Supp. 1420, 1423 (D. Del. 1992) (criticizing the justifications given for the

---

[5]      I am, of course, aware that the underlying litigation had its own underlying administrative investigations that might, in theory, position this case somewhere between Dingwell and A. Johnson & Sons, but suffice it to say that the parties' summary judgment papers do not invite that kind of analysis.  Nor am I inclined to think that such an analysis would prove fruitful for the defendants in light of the fact that the underlying complaint does not involve an administrative enforcement action by the Maine DEP or federal EPA.

imposition of a heightened standard and applying a preponderance of the evidence standard); see also Sullivan v. Porter, 861 A.2d 625 (Me. 2004) (discussing standards applicable to proof of the existence and terms of a contract).  In any event, Michigan Mutual did not qualify or deny Barrett's statement of material fact that Michigan Mutual issued a general liability policy to Barrett, so that fact is deemed admitted.  In addition, Michigan Mutual itself asserts that any policy Michigan Mutual would have issued to Barrett between 1983 and the end of 1985 would have conformed to the ISO standard form and would have afforded coverage for liability in "damages" arising from an occurrence that causes property damage, excluding damages caused by pollution, unless such pollution occurred during a sudden and accidental event.  (Michigan Mutual's Mot. at 3.)  Thus, there is no genuine issue of material fact for trial and Michigan Mutual's duty to defend turns on the same coverage language and exclusion provision as does Continental's.  I conclude that the foregoing discussion of Continental's duty to defend applies with equal force to Michigan Mutual's duty to defend.

Michigan Mutual makes one argument not presented in Continental's motion.  According to Michigan Mutual, a duty to defend could not arise from any policy it issued between 1983 and 1985, "to the extent the underlying . . . complaint seeks contribution for past and future costs associated with remediation of alleged pollution" because such liabilities are not properly "damages," citing Patrons Oxford Mutual Insurance Company v. Marois, 573 A.2d 16 (Me. 1990).  (Michigan Mutual's Mot. at 7.)  In Marois the Law Court held:

> that insurance contract language providing coverage for amounts the insured is 'legally obligated to pay as damages' does not cover expenses the insured incurs in meeting state clean-up demands [and] that the duty to defend the insured against 'any suit . . . seeking damages' does not include an administrative proceeding that can award no damages.

573 A.2d at 16.  As was the case in <u>Marois</u>, the language of the policy at issue "provides coverage not for 'property damage' itself, but for 'sums which the insured shall become legally obligated to *pay as damages* because of . . . property damage." <u>Id.</u> at 18.  However, unlike in <u>Marois</u>, the underlying complaint presents an action by a private party to recover money, not to impose injunctive relief.  Thus, the Law Court found it important to indicate that the underlying state administrative action at issue in <u>Marois</u> could not lead to the recovery of damages by the Maine DEP, but could only result in an order to conduct a clean-up. <u>Id.</u> at 20.  Nor, observed the Court, was the DEP suing for reimbursement. <u>Id.</u>  Because neither of these circumstances were presented in <u>Marois</u>, the Law Court concluded that "there has been no 'suit against the insured seeking damages,' and the insurer has no present duty to defend." <u>Id.</u>  Unlike <u>Marois</u>, of course, the underlying complaint in this action meets the distinguishing characteristics identified by the Law Court in <u>Marois</u> insofar as it could lead to the recovery of damages or an order to reimburse the plaintiff in the underlying action.  Accordingly, the fact that the insurance policy conditions coverage on the existence of liability in "damages" does not preclude the imposition of a duty to defend in this case.  I recommend that the Court deny Michigan Mutual's motion for summary judgment and also grant, in part, Barrett's motion for summary judgment because there is no genuine issue of material fact by virtue of Michigan Mutual's failure to respond to Barrett's statement of material fact and Michigan Mutual's concession that its general liability policy or policies would have contained the same pollution exclusion and sudden and accidental exception to the exclusion as is contained in the Continental policy.

## C.    First State's Duty to Defend

According to First State, it is entitled to summary judgment against Barrett's declaratory judgment and breach of contract claims for two reasons:

[1]  Under the plain and unambiguous language of the excess insurance policies issued by First State to Barrett Paving—as interpreted by courts in Maine and throughout the country—First State has no duty to defend Barrett Paving against the allegations asserted in Citizens' Third Party Complaint.  As an excess insurer, First State has no defense obligation absent exhaustion of the limits underlying it's policies.  [2]  In addition, First State has no defense obligation because coverage for the claims alleged in the Third-Party Complaint is precluded by the pollution exclusion contained in First State's excess policies.

(First State's Mot. at 2, Docket No. 50.)  First State asserts that Maine law governs these questions and Barrett does not oppose that assertion.  (First State's Mot. at 6 n.5.)

First State's first argument concerns the question of whether an excess/umbrella insurer must "drop down" to assume the responsibilities of an insolvent primary insurer.  (Id. at 7.)  First State quotes conditions in its policies that make the duty to defend contingent upon the exhaustion of the limits of coverage extended under any underlying policies.  (Id. at 8-9.)  This assertion is premised, primarily, on "Condition I" of first layer excess/umbrella policy number 943741 (covering the period between December 14, 1979, and February 15, 1981):

I.  Underlying Insurance.  If underlying insurance applicable in any one OCCURRENCE is exhausted by payment of judgment or settlement on behalf of the INSURED, the COMPANY shall be obligated to assume charge of the settlement or defense of any claim or proceeding . . . but only where this policy applies immediately in excess of such underlying insurance, without the intervention of excess insurance of another insurer.

(Condition I, Ex. P at FS00020.)  As for the second excess/umbrella policy, number 928333 (covering the period between February 26, 1980, and February 15, 1981), First State asserts that that policy contains no defense obligation whatsoever and otherwise is consistent with the terms of policy 943741.  (First State's Mot. at 10 n.6.)  Because it is stipulated that coverage under the primary policy issued by the bankrupt Midland has not been exhausted, First State reasons that it is entitled to judgment.  (First State's Mot. at 9.)

Barrett argues that certain language in First State's policy 943741 obligates First State to pay Barrett's defense costs arising from the underlying complaint.  (Barrett's Mot. at 6-7.)

16

Specifically, Barrett points to a "Defense-Settlement" provision found at "Insuring Agreement" IV of the policy:

> IV. DEFENSE-SETTLEMENT
> A.  With respect to any OCCURRENCE not covered, as warranted, by the underlying policies listed in Schedule A hereof, [6] whether collectible or not, or not covered by any other underlying insurance collectible by the INSURED but covered by the terms and conditions of this policy, except for the RETAINED LIMIT stated in item 3 I B of the Declarations, the Company shall:
>
>     1.  defend any suit against the insured alleging PERSONAL INJURY, PROPERTY DAMAGE or ADVERTISING INJURY or DAMAGE and seeking damages therefore, even if such suit is groundless, false or fraudulent; but the COMPANY may make such an investigation, negotiation or settlement of any claim or suit as it deems expedient. The INSURED shall promptly reimburse the COMPANY for any amount paid in the satisfaction of cases defended hereunder within the retained limit after making proper deduction for all recoveries and salvage collections, but excluding all loss, expense and legal expense.

(Insuring Agreement IV.A, Ex. P at FS 00017.)  According to Barrett, First State must "drop down" because the policy plainly states, in Barrett's words, "that First State will defend any suit against the insured alleging property damage with respect to any occurrence that is not covered by any other underlying insurance collectible by the insured."  (Barrett's Mot. at 8-9.)  In making this argument, Barrett focuses on First State's failure to specifically name Midland in Schedule A of the policy, suggesting that this omission makes the Midland policy an "other" policy under provision IV.A.  From that premise, Barrett reasons that because Midland is bankrupt, the underlying policy issued by Midland is no longer collectible, triggering a duty to defend on the part of First State.  (Id. at 9.)

First State argues that the first clause of provision IV.A controls this dispute as well as the more direct language of Subsection IV.B (First State's Mot. at 10-11), which provides:

> B.  When underlying insurance, whether or not listed in Schedule A, does apply to an OCCURRENCE, the COMPANY shall have no duty to pay defense,

---

6       The policy fails to identify any underlying policies in a Schedule A, making this part of the provision immaterial.

investigations, settlement or legal expenses covered by such underlying insurance;
however, the COMPANY shall have the right and opportunity to associate with
the INSURED and any underlying insurer in the defense and control of any claim
or suit reasonably likely to involve the COMPANY under this policy.

(Insuring Agreement IV.B, Ex. P at FS 00017.)  In support of this position, First State cautions

that courts are hesitant to construe excess insurance policies in ways that would, in essence,

transform the excess insurer into a primary insurer.  (First State's Mot. at 13-17.)[7]

The parties have stipulated that First State's excess policies were all "umbrella" policies.

"'Umbrella' policies differ from standard excess insurance policies in that they are designed to fill

gaps in coverage both vertically (by providing excess coverage) and horizontally (by providing

primary coverage).  In the latter instance, the Umbrella is said to 'drop down' to provide primary

coverage where the underlying policy provides no coverage at all."  Comm. Union Ins. Co. v.

Walbrook Ins. Co., 41 F.3d 764, 767 n.4 (1st Cir. 1994).  See also Premcor USA, Inc. v. Am.

Home Assur. Co., 400 F.3d 523, 525 (7th Cir. 2005) (describing the two functions of an umbrella

policy).

[T]he broader function served by umbrella policies [is to] extend[] coverage even
to unanticipated "gaps." As one authority has explained, umbrella policies
effectively shift away from the insured the burden of choosing the risks to which
the insured remains exposed:

[an umbrella] arrangement contrasts with the method of providing
Excess Liability insurance along traditional lines.  Under the
excess approach, it is up to the insured . . . to choose those
exposures against which excess protection is desired.  The obvious
disadvantage lies in the possibility of a wrong guess about the
critical exposures.  Under the Umbrella Liability contract, the
principal guesswork is in the [underwriter's] rating [of the overall
risk]. . . .

---

[7]    First State also maintains that a pollution exclusion contained in its excess policy precludes any finding that
any of the claims in the underlying complaint could be covered by its policies.  (First State's Mot. at 18-20.)  The
pollution exclusion found in the First State policies is the same as the exclusion set forth in the Continental policy
discussed above and I therefore disregard that aspect of First State's motion for the reasons set forth in my
discussion of Continental's motion.

Comm. Union Ins. Co. v. Walbrook Ins. Co., 7 F.3d 1047, 1053 (1st Cir. 1993) (quoting F.C. &
S. Bulletins, "Companies and Coverages: Specialty Lines" at U-1 (December 1980)).  But see
Globe Indem. Co. v. Jordan, 634 A.2d 1279, 1284 (Me. 1993) (suggesting in *dicta* that umbrella
policies are like other excess policies in that they afford coverage only in circumstances where
primary coverage is exhausted, i.e., not where there are gaps in the primary coverage, but
addressing, in any event, a policy that was neither purely excess nor umbrella and also affirming
equitable apportionment of defense costs).

Of course, the primary determinant of an insurer's legal obligations under an insurance
contract must be the language of the contract itself.

> A duty to defend exists if a complaint reveals a potential that the facts ultimately
> proved may come within the coverage.  An insurance contract must be construed
> in accordance with the intention of the parties, which is to be ascertained from an
> examination of the whole instrument.  Further, all parts and clauses must be
> considered together so that it may be seen if and how one clause is explained,
> modified, limited or controlled by the others.

State Farm Mut. Auto. Ins. Co. v. Montagna, 874 A.2d 406, 408 (Me. 2005) (internal quotation
marks and citations omitted).  The primary objective is to "give reasonable effect to all terms
whenever possible."  Walbrook Ins. Co., 7 F.3d at 1052.  Although "[a]ny ambiguity in the
insurance policy language is resolved in favor of finding a duty to defend," Me. Mut. Fire Ins.
Co. v. Gervais, 745 A.2d 360, 363 (Me. 1999), a court need not strain to find ambiguity.  Langer
v. United States Fid. & Guar. Co., 552 A.2d 20, 22 (Me. 1988).

The Defense-Settlement provision of First State's policy provides that First State will
afford a defense to Barrett for occurrences covered by the terms and conditions of First State's
umbrella policy (1) when the occurrence at issue is not covered by a Schedule A underlying
policy, "whether collectible or not" or (2) when the occurrence is "not covered by any other
underlying insurance collectible by the insured."  The question presented here is where the

Midland policy falls.  Was the Midland policy an underlying policy within the ambit of Schedule

A or was it an "other" underlying policy?

     Barrett argues that the Midland policy was not a Schedule A underlying policy because

First State did not name Midland in Schedule A.  (Pl.'s Mot. at 6; Pl.'s Opposition to First State's

Mot. at 6.)  I disagree that the failure to name Midland in Schedule A generates any ambiguity in

the otherwise clear language of Insuring Agreement IV.A.  Schedule A is First State's "Schedule

of Underlying Policies."  Under the heading "Policies," Schedule A reads:

> <u>Comprehensive General Liability</u>
>     Including:
> Personal Injury Liability
> Blanket Contractual
> Employee Benefits Liability
> Products
> Completed Operations
> Non-owned Watercraft
> Host Liquor Law Liability
> Blanket XCU
> Incidental Malpractice
> Employees as Additional Insureds
>
> <u>Automobile Liability</u>
>
> <u>Employers' Liability</u>

Barrett does not suggest that the Midland policy was anything other than a comprehensive

general liability, or CGL, policy.  Indeed, the parties' stipulation describes the Midland policy as

*the* primary liability insurance coverage from December 14, 1979, to February 15, 1980.  (Joint

Stip. ¶ 29.)  The parties also describe the Continental policy as "replacing" the Midland policy in

February 1980.  (<u>Id.</u> ¶ 30.)  The underlying Continental policy is a CGL policy.  (<u>Id.</u> ¶ 31.)  In

my view Schedule A adequately references the Midland policy, albeit not by name or policy

number.[8]  This reading is the most natural reading because it harmonizes First State's broad references to entire categories of underlying policies in Schedule A with the language of Insuring Agreement IV.A and also corresponds with Insuring Agreement IV.B's broad denial of any duty to assume defense and related costs when any underlying coverage "applies."  Additionally, this reading make First State's duty to defend correspond with the basic nature of an umbrella policy: First State will defend when there is a gap in the underlying coverage identified in Schedule A, unless the insured has some other policy that affords coverage for the particular occurrence at issue that is collectible.

Based on my reading of the First State umbrella policy and Schedule A, the Midland policy is not an "other" policy and, therefore, the fact that it is not collectible is not material. Instead, the question of whether First State's duty to defend is triggered depends on whether or not the Midland policy extended coverage to the occurrence(s) alleged in the underlying complaint, "whether [that coverage is] collectible or not."  (Insuring Provision IV.A, Ex. P at FS00017.)  Because Barrett fails to make any presentation to support a finding that the Midland policy did not extend coverage to the occurrence(s) alleged in the underlying complaint, Barrett fails to establish that there is a genuine issue of material fact capable of preventing the entry of summary judgment in favor of First State.

### D.      Barrett's Motion for Summary Judgment

Based on the foregoing analysis, I conclude that Barrett is entitled to judgment as a matter of law that Continental and Michigan Mutual (but not First State) owe Barrett a duty to defend in connection with the underlying action and must reimburse Barrett for its defense costs

---

[8]      I fail to understand how the Midland policy, i.e., the *primary* underlying liability policy, could be reasonably regarded as an "other" policy falling under the second category identified in Insuring Agreement IV.A.

to date.  In addition to seeking summary judgment on the defendants' duty to defend, Barrett also

asks for an award of attorneys' fees in connection with this action.  (Pl.'s Mot. at 17-18.)

"[A]n award of attorney fees to the insured is appropriate when it is clear from a

comparison of the insurance policy and the complaint that the insurance company is potentially

liable to indemnify the insured.  An award . . . is not appropriate if the law is unsettled with

respect to a duty to defend a particular action or if the possibility that the insurance policy

requires coverage is 'not something that is obvious on the face of the complaint.'"  Gervais, 745

A.2d at 363 (quoting Union Mut. Fire Ins. Co. v. Inhabitants of Town of Topsham, 441 A.2d

1012, 1019 (Me. 1982)).  In my view, the proper resolution of the duty to defend question is

clear based on the Law Court's opinion in Dingwell.  Accordingly, I recommend that the Court

grant Barrett's summary judgment request for an award of the attorneys' fees incurred in

connection with this action.

**CONCLUSION**

Based on the discussion set forth above, I **RECOMMEND** that the Court:

(1)     **DENY** the motion for summary judgment filed by Continental Insurance
        Company (Docket No. 49);

(2)      **DENY** the motion for summary judgment filed by Michigan Mutual
        Insurance Company (Docket No. 54);

(3)     **GRANT** the motion for summary judgment filed by First State Insurance
        Company (Docket No. 50); and

(4)     **GRANT** Barrett's motion for summary judgment (Docket No. 53) against
        Continental Insurance Company and Michigan Mutual Insurance Company
        and **DENY** it against First State Insurance Company.

<u>NOTICE</u>

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.


/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

Dated:  November 1, 2005

23