UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| BARRETT PAVING MATERIALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 04-61-B-S |
| | ) | |
| CONTINENTAL INSURANCE COMPANY, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**RECOMMENDED DECISION ON MOTIONS FOR SUMMARY JUDGMENT
FILED BY BARRETT PAVING MATERIALS, CONTINENTAL INSURANCE
COMPANY, FIRST STATE INSURANCE COMPANY AND MICHIGAN MUTUAL
INSURANCE COMPANY**

This Recommended Decision addresses four motions for summary judgment in this

declaratory judgment and breach of contract action filed by Barrett Paving Materials against the

named insurance companies.  Barrett seeks with this action to impose on the defendant insurance

companies a duty to defend Barrett in relation to an underlying third-party CERCLA action

brought against Barrett by Citizens Communications Company, in which it was alleged, among

other things, that Barrett has contributory liability to Citizens based on one or more negligent

acts of pollution.  The core issue of the pending dispute is whether the general allegations set

forth in Citizens's underlying complaint excluded the possibility that liability might be imposed

on Barrett based on a "sudden and accidental" discharge of pollution, thereby precluding

coverage under the defendants' policies.  Based on my analysis of this question and certain

ancillary questions raised in the motions for summary judgment, I recommend that the Court

deny the motions for summary judgment filed by Continental Insurance Company and Michigan

Mutual Insurance Company, grant the motion for summary judgment filed by First State
Insurance Company, and grant, in part, the motion filed by Barrett Paving Materials to the extent
that motion pertains to Barrett's claims against Continental Insurance Company.

**FACTS**

The following statement of facts is drawn from the underlying complaint, a joint
stipulation filed by all of the parties and Local Rule 56 statements filed by Barrett and Michigan
Mutual.

**A.     The Underlying Complaint**

On November 22, 2002, the City of Bangor filed suit against Citizens Communication
Company seeking, among other relief, a judgment ordering Citizens to pay all, or an equitable
portion of, the costs incurred by the City in association with its ongoing, voluntary investigation,
corrective action and other response actions to remediate a tar slick on the bottom of the
Penobscot River in the vicinity of certain operations historically undertaken by Citizens and
other entities, including Barrett Paving.  In due course, Citizens filed a third-party complaint
against Barrett, among others, in which Citizens alleged that Barrett was liable to contribute
toward or indemnify Citizens's liability to Bangor, if any, on the following general allegations:

> 11.     The tar and asphalt plant in Bangor, Maine, presently owned by
> Barrett . . . has been in operation since approximately 1937 and continues to
> operate at the present time.

> 12.     Barrett . . . acquired the Barrett Plant in or about 1979.

> 13.     The Barrett Plant . . . has received, produced, stored and/or
> distributed tar and asphalt for road paving and other purposes.

* * * *

> 15.     On one or more occasions since Barrett . . . has owned and
> operated the Barrett Plant, asphalt materials containing poly-aromatic

2

hydrocarbons, also known as PAHs, were released from the Barrett Plant into the Penobscot River.

16.    Upon information and belief, the soil at the Barrett Plant is contaminated with substances that contain PAHs.

17.    Sewers historically located in or near the Barrett Plant drained, directly and without treatment, into the Penobscot River.

18.    Tidal action of the Penobscot River causes contamination from the Barrett Plant to be flushed into the river.

19.    Upon information and belief, hazardous substances and hazardous wastes from the Allied Plant were released into the Penobscot through sewers, overland flow of water and/or tidal action.

\* \* \* \*

## COUNT I — CERCLA CONTRIBUTION

\* \* \* \*

25.    Upon information and belief, releases of hazardous materials into the Penobscot have occurred on one or more occasions at the Barrett Plant.

\* \* \* \*

28.    As a responsible party [for contamination of the Penobscot], Barrett . . . is liable for an equitable share of response costs related to the Penobscot River.

\* \* \* \*

## COUNT III — COMMON LAW CONTRIBUTION

36.    To the extent Citizens is found liable in tort to the City or to any other third party for harm caused by hazardous substances or other materials in the Penobscot River that originated at the Barrett Plant, Barrett . . . is jointly liable for such harm.

\* \* \* \*

## COUNT V — NEGLIGENCE

3

44.     Barrett . . . breached its duty of care by causing and/or permitting one or more releases of hazardous substances or other materials from the Barrett Plant.

(Joint Stip. ¶ 9, Docket No. 51; Third Party Compl. Against Barrett Paving Materials, Docket

No. 1:02-cv-183-B-S, Docket No. 17.[1])

## B.     Additional Facts Generated by Stipulation

In 1979, Barrett Paving purchased certain assets from Allied Chemical, which included a

waterfront storage facility located on the banks of the Penobscot River in Bangor, Maine.  At its

Bangor, Maine location, Barrett Paving stored liquefied asphalt, which it sold to local

governments and businesses for use in conjunction with road construction.  The liquid asphalt

was not manufactured on the site.  Rather, the liquid asphalt was delivered by barges to Barrett

Paving's waterfront storage facility in Bangor, Maine.  (Joint Stip. ¶¶ 3-5.)

In response to discovery requests propounded by Continental, Barrett answered the

following interrogatory in the following manner:

**Interrogatory No. 7**
If you contend that any spill, release, dispersal or discharge of any pollutant or contaminant took place at the Site, please identify the particular circumstances of each such spill, release, dispersal or discharge.

**Answer No. 7**
On July 21, 1988, hot asphalt spilled from a barge into the Penobscot River while the barge was being unloaded. The asphalt, which hardened as it entered the River, was fully recovered.

(Id. ¶ 24.)  Similarly, Roland Fogg, Barrett 's plant manager in Bangor, testified as a 30(b)(6)

designee as follows:

Q.  Are you aware of any sudden and/or accidental discharge of any pollutants from the Barrett Paving Plant into the Penobscot River?
A.  None that I'm aware of.
Q.  At any time?

---

[1]     The Joint Stipulation reproduces only paragraphs 15-19 of the underlying complaint.  I take notice of the entire underlying complaint.

4

A  Other than the July 21 '88, that is the only discharge that I am aware of.

(Id. ¶ 24.)

## C.      Continental Insurance Company's Policy (Joint Stip. ¶¶ 23, 29-31)

Barrett Paving initially obtained primary liability insurance coverage from Midland Insurance Company.  That primary insurance was in effect from approximately December 14, 1979, to February 15, 1980.  On or around February 15, 1980, Continental issued a primary liability insurance policy to Barrett Paving (Policy No. SRL3635963), thereby replacing the Midland primary policy.  In regard to Continental's primary comprehensive general liability (CGL) Policy No. SRL 363 59 63, Barrett Paving paid a total premium of approximately $195,500.00.  It is undisputed that Continental insured Barrett under at least three polices issued in the early 1980s.  Continental does not contest that the language of the coverage provisions of those policies would extend to the kinds of potential liability generated by Citizens's third-party action.  However, Continental maintains that Citizens's allegations "clearly seek recovery for discharges into the Penobscot River that occurred over a period of decades" and, therefore, coverage is conclusively precluded by one of the policies' exclusionary provisions. (Continental's Mot. at 2, Docket No. 49.)  It is undisputed that each Continental policy issued to Barrett contained the following exclusion from coverage:

> (f) bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic materials, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

(Joint Stip. ¶ 23.)

5

**D.      Michigan Mutual Insurance Company's Policy**

Michigan Mutual concedes that between 1982 and December 31, 1985, it used policy

forms for commercial liability coverage that extended coverage for "all sums which the insured

shall become legally obligated to pay as damages because of . . . property damage . . . to which

this policy applies, caused by an occurrence."  (Michigan Mutual's Mot. at 3, Docket No. 54.)

The parties have stipulated that prior to January 1, 1986, Michigan Mutual used the CGL policy

form attached to their joint stipulation as exhibit W.  (Joint Stip. ¶ 54.)  Michigan Mutual asserts,

and Barrett appears willing to concede, that any policies issued to Barrett pre-1986 would have

contained an exclusion for liability arising from pollution except for any "discharge, dispersal,

release or escape [that] is sudden and accidental."[2]  (Michigan Mutual's Mot. at 3; Barrett's Mot.

at 16-17, Docket No. 53; see also Joint Stip. ¶ 54, Ex. W, Exclusion (f).)  The question is

whether there exists a genuine issue of material fact whether Michigan Mutual actually issued

such a policy to Barrett.

Barrett asserts through the affidavit of Anthony Martino, II, its assistant secretary:

"According to the available business records of Barrett . . ., Michigan Mutual . . . provided

general liability coverage for Barrett . . . from April 1, 1983 to April 1, 1988 pursuant to policy

number SR-32-0-72010-2."  (Pl.'s Statement of Fact ¶ 1, Docket No. 52.)  Subsequently, in

slightly different words, Barrett asserts: "As noted in Anthony L. Martino's letter of August 7,

2003, Michigan Mutual provided general liability coverage to Barrett Paving for the period from

April 1, 1983 to April 1, 1988 pursuant to policy number SR-32-0-72010-2."  (Id. ¶ 6.)  Barrett's

---

[2]        The parties have stipulated that after January 1, 1986, Michigan Mutual used a comprehensive general
liability policy form that contained a "total" or "absolute" pollution exclusion.  (Joint Stip. ¶ 55.)  Michigan Mutual
asserts that it is entitled to judgment that any policy issued to Barrett after January 1, 1986, would not entitle Barrett
to either a defense or indemnification.  (Michigan Mutual's Mot. at 10.)  Barrett takes the position that it disputes
this assertion based on Michigan Mutual's failure to ever produce any of Barrett's policies (Barrett's Response to
Michigan Mutual's Mot. at 8), but it has stipulated to the fact that after January 1, 1986, the policy would have been
in the form that contained the total pollution exclusion (Joint Stip. ¶ 55, citing Ex. X) and it has failed to raise an
argument that the language of the total pollution exclusion would not preclude a duty to defend.

"available business records" do not include a copy of any actual policy issued by Michigan Mutual and Michigan Mutual asserts that it does not have records of any policies issued to Barrett in the 1980s.

In an opposing statement of material facts (Docket No. 63), Michigan Mutual denies Barrett's statement that Michigan Mutual issued a general liability policy to Barrett prior to 1986. (Docket No. 63 ¶ 1.)  Michigan Mutual also asserts that the Martino affidavit and the documents Mr. Martino relies upon to form his opinion are insufficient to support findings of fact concerning the effective dates of any policy that may have been issued or the locations covered by the policy.  (Id. ¶¶ 4-6.)  In addition, Michigan Mutual "objects to the reliance on and reference to secondary documents to prove the terms of a written insurance policy that has not been produced," citing MetLife Capital Corporation v. Westchester Fire Insurance Company, 224 F. Supp. 2d 374, 384 (D. P.R. 2002).  (Id. ¶¶ 1, 11, 14.)  Finally, Michigan Mutual objects to Mr. Martino's affidavit because it "does not demonstrate any basis for knowledge about the coverage other than the documents he reviewed."  (Id. ¶ 11, 14.)

The policy documents that Mr. Martino located and forwarded to Michigan Mutual are found in exhibits E and G.  Exhibit E contains roughly a score of policy endorsements for policy number SR32-0-720102 dated between April 1987 and February 1988.  Based on my review of these endorsements, I fail to see how they are probative of the existence of a policy prior to 1986, except insofar as Barrett's other, earlier documents reference the same policy number that existed in 1987 and 1988.  Exhibit E includes two additional documents.  The first is a letter from Barrett to Mr. Barry R. Harper, Senior Vice President-General Manager of Financial Guardian of Troy, Michigan.  The letter concerns renewal of insurance policies for April 1, 1985, through March

31, 1986,[3] but makes no reference to any particular insurance policy number.  (Id. at 3.)  The second document is a Barrett internal memorandum concerning Barrett's 1983 "insurance program."  The memorandum tends to establish that Financial Guardian was Barrett's insurance broker and brokered Barrett's insurance coverage, including CGL coverage from Michigan Mutual.  The memorandum does not identify any policy by number.  (Id. at 4.)

Exhibit G contains three additional documents in Barrett's possession.  The first is another internal memorandum dated October 23, 1985, relating to "Automobile and General Liability Insurance Forms."  (Ex. G at 2.)  The body of the memorandum concerns confusion on the part of Barrett personnel over what loss forms should be used and how they should be prepared to report losses to Barrett's insurers.  (Id.)  The memorandum does not identify any insurers or policies by name.  However, the second and third documents are attachments to this memorandum.  They are loss notice forms used for reporting losses to Barrett's insurers.  The first is a "General Liability Loss Notice (Other than Automobile)," and identifies Michigan Mutual as the insurer, names policy number SR 32-0-72010-2, and names the effective policy term as April 1, 1985, through April 1, 1986.  (Id. at 4.)

E.    **First State Insurance Company's Policy** (Joint Stip. ¶¶ 32-53)

First State Insurance Company (hereinafter "First State") issued three excess umbrella liability insurance policies to Barrett Paving.  On or around December 14, 1979, First State issued excess umbrella liability Policy No. 943741.  First State's Policy No. 943741 was a first layer excess policy and was in effect from December 14, 1979, to February 15, 1981.  As a first layer excess policy, Policy No. 943741 was excess over the underlying primary liability insurance policy issued by Midland to Barrett Paving from approximately December 14, 1979, to

---

[3]    The April 1 through March 31 timeframe reflects the annual policy period and that period is also reflected in the other documents in exhibits E and G.

February 15, 1980, and thereafter it was excess over the underlying primary policy issued by

Continental.  The limits of liability under First State's excess Policy No. 943741 are $2,000,000,

which is in excess of the $1,000,000 limits of liability under the Midland primary insurance

policy and the $1,000,000 limits under the Continental primary insurance policy.  In regard to

First State's excess liability Policy No. 943741, Barrett Paving paid a total premium of

$35,190.00.

On or around February 26, 1980, First State issued a second excess umbrella liability

insurance policy (Policy No. 928333) to Barrett Paving.  First State's excess Policy No. 928333

was in effect from February 26, 1980, to February 15, 1981.  In regard to First State's excess

liability Policy No. 928333, Barrett Paving paid a total premium of $9,700.00.  Policy No.

928333 was a third layer excess policy, which was excess not only to First State's first layer

excess policy (Policy No. 943741), but also to a second layer excess policy issued to Barrett

Paving by Transit Casualty Company (hereinafter "Transit") (Policy No. SCU955345).  In

consideration for the coverage afforded under Transit's second layer excess Policy No.

SCU955345, Barrett Paving paid a total premium of $20,000.00.  The total limit of First State's

liability, under the terms and conditions set forth in Policy No. 928333, was $10,000,000, which

was in excess of the $11,000,000 limits of liability afforded under the Midland primary insurance

policy, the first layer excess Policy No. 943741 issued by First State, and the second layer excess

Policy No. SCU955345 issued by Transit.

On or around April 1, 1988, First State issued a third excess umbrella liability insurance

policy (Policy No. EU006684) to Barrett Paving.  First State's excess Policy No. EU006684 was

in effect from April 1, 1988, to April 1, 1989.  In regard to First State's excess liability Policy

No. EU006684, Barrett Paving paid a total premium of $16,750.00.

Midland is now insolvent.  Barrett Paving does not possess a copy of the primary insurance policy issued by Midland, and it has no knowledge of the terms and conditions of the primary insurance policy issued by Midland.  The primary insurance policy issued to Barrett Paving by Midland has not been exhausted as a result of claims paid on behalf of Barrett Paving.

On or about July 16, 2003, Anthony L. Martino tendered to First State the defense of the third party action brought by Citizens.  On July 18, 2003, First State acknowledged receipt of notification of the third party complaint filed by Citizens.  Anthony L. Martino received a letter dated July 24, 2003, from David Thomas of The Hartford, who is handling Barrett Paving's environmental claims for First State, indicating that The Hartford was in the process of searching for the policies issued to Barrett Paving.  Anthony L. Martino received an additional letter dated November 10, 2003, from David Thomas of The Hartford, denying coverage for the claim.

## DISCUSSION

"The role of summary judgment is to look behind the facade of the pleadings and assay the parties' proof in order to determine whether a trial is required."  Plumley v. S. Container, Inc., 303 F.3d 364, 368 (1st Cir. 2002).  A party moving for summary judgment is entitled to judgment in its favor only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is material if its resolution would "affect the outcome of the suit under the governing law," and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In reviewing the record for a genuine issue of material fact, the Court must view the summary judgment facts in the light most favorable to the nonmoving party and credit all

10

favorable inferences that might reasonably be drawn from the facts without resort to speculation. Merchants Ins. Co. v. United States Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998).  If such facts and inferences could support a favorable verdict for the nonmoving party, then there is a trial-worthy controversy and summary judgment must be denied.  ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002).

## A.      Continental 's Duty to Defend

Barrett and Continental are in agreement that Maine law determines Continental's duty to defend.  Both cite exclusively Maine precedent in support of their statements of the governing legal standard.  (Continental's Mot. at 4; Barrett's Mot. at 4-6.)  Pursuant to Maine common law, it is a question of law whether an insurer owes its insured a duty to defend.  Bucci v. Essex Ins. Co., 393 F.3d 285, 290 (1st Cir. 2005).  "Maine resolves the question of 'whether there exists a duty to defend . . . by comparing the [underlying] complaint with the terms of the insurance contract.'"  Id. (quoting Elliott v. Hanover Ins. Co., 711 A.2d 1310, 1312 (Me. 1998)).  For the duty to defend to exist, the allegations of the underlying complaint must raise a "potential for liability within the coverage and contain[] no allegations of fact which would necessarily exclude coverage."  Travelers Indem. Co. v. Dingwell, 414 A.2d 220, 227 (1980).  "This is the case even when the undisputed facts show the injury in question was not covered by the policy."  Bucci, 393 F.3d at 290.

> Under this comparison test, the insurer has a duty to defend if the underlying complaint discloses a "potential or a possibility" for liability within the policy's coverage.  Significantly, the duty to defend is broader than the duty to indemnify, and an insurer may have to defend before it is clear whether there is a duty to indemnify.  Maine requires that insurance policies be interpreted most strongly against the insurer.  Any ambiguity must be resolved in favor of a duty to defend.

Id. (some internal quotation marks omitted) (citing and quoting Elliott, 711 A.2d at 1312;
Commercial Union Ins. Co. v. Royal Ins. Co., 658 A.2d 1081, 1083 (Me. 1995); Mass. Bay Ins.
Co. v. Ferraiolo Constr. Co., 584 A.2d 608, 609 (Me. 1990); and Baybutt Constr. Corp. v.
Commercial Union Ins. Co., 455 A.2d 914, 921 (Me. 1983), overruled on other grounds, Peerless
Ins. Co. v. Brennon, 564 A.2d 383 (Me. 1989)).

        According to Continental, it is entitled to summary judgment because "there is not even
the barest suggestion [in Citizens's third-party complaint] that Barrett . . . was responsible for any
'sudden and accidental' discharge of pollutants that might trigger the exception to this exclusion."
(Continental's Mot. at 4.)  According to Barrett, however, that point is moot because the question
is whether a legal or factual basis might arise at trial that would obligate Continental to afford
coverage.  (Barrett's Opp'n Mem. at 5, Docket No. 59.)  But, says Continental, Barrett's
deposition testimony and interrogatory answers assert that there were no accidental or sudden
releases during the relevant timeframe.  (Continental's Mot. at 10.)  So what, rejoins Barrett, an
insured is not to be forced to try the underlying action against its insurer or to confess liability in
order to obtain a defense, the only question is whether the underlying complaint "excludes the
potential that the alleged discharge of pollutants . . . was sudden and accidental," which it does
not.  (Barrett's Opp'n Mem. at 9.)  I agree with Barrett.  The underlying complaint's general
allegations did not foreclose the potential that Barrett could have liability to Citizens on the basis
of any sudden and accidental discharge of pollutants that might be proved by Citizens.  That
legal conclusion is virtually compelled by the Law Court's opinion in Travelers Indemnity
Company v. Dingwell, 414 A.2d 220 (Me. 1980).

        In Dingwell, the Law Court considered whether a class action lawsuit by residents of
Gray over well water contamination triggered a duty to defend the operator of an industrial waste

facility under certain insurance policies, two of which contained the same general pollution exclusion and "sudden and accidental" exception found in Continental's insurance policy.  414 A.2d at 223.  The Court found that a duty to defend arose from these policies, id., because the comparison test must focus exclusively on the allegations of the underlying complaint and, although certain counts alleged intentional acts, id. at 224, and the harm complained of allegedly arose from "the gradual permeation of the ground," id., the more general allegations of "negligence" reflected that the plaintiffs had "no way of knowing" whether the pollution at issue arose from "unintentional spills, leaks, or other accidents," id. at 224-25.  Thus, in the Court's view, "[t]he behavior of the pollutants in the environment, after release, is irrelevant" to the language of the pollution exclusion and its sudden and accidental exception.  Id. at 225.  The Court rejected arguments, which have been repeated here, that a duty to defend could not arise unless the underlying complaint specifically alleged a sudden and accidental release.  Id. at 225-26.  The Court observed that a complainant need only give notice of his or her claim and that a defendant seeking a defense from an insurer is entitled to a defense even if the underlying complaint "is legally insufficient to withstand a motion to dismiss," so long as "it shows an intent to state a claim within the insurance coverage."  Id. at 226.  The circumstances in Dingwell are not readily distinguishable from those presented in the case at bar and the Law Court's holding therein is, accordingly, binding on this dispute.[4]

Continental argues that this case should be determined the way the First Circuit resolved the duty to defend question in A. Johnson & Co v. Aetna Casualty & Surety Co., 933 F.2d 66

---

[4]      The Law Court also rejected another argument repeated in this case to the effect that the Court should engage in a burden-shifting, evidentiary analysis of the underlying facts.  The Law Court flatly rejected this approach, reiterating the holding of a prior opinion wherein the Court concluded that "the most logical rule is the one which predicates the duty to defend solely on the allegation in the complaint, even when the insurer has knowledge of facts to the contrary."  Dingwell, 414 A.2d at 227 (quoting Am. Policyholders' Ins. Co. v. Cumberland Cold Storage, 373 A.2d 247, 250 (Me. 1977)).

(1st Cir. 1991). (Continental's Mot. at 5-7.) That case addressed the duty of an insurer to defend and indemnify the plaintiff in connection with a Maine DEP action to remediate a hazardous waste site that was used by the plaintiff and others as a dumping ground for roughly 13 years. Id. at 67. The First Circuit concluded that these circumstances precluded a duty to defend or indemnify, based on pollution exclusion language like that found in this case, because it was clear from the underlying administrative action that the discharges at the site could not be accidental. Id. at 70-71. Thus, the First Circuit observed that "the PRP letters contained factual details which were totally inconsistent with any view that the pollution at the McKin site was 'sudden and accidental.'" Id. at 72. Because the appropriate analysis directs the Court to the allegations set forth in the underlying third-party complaint, I conclude that the proper resolution of this dispute is controlled, indeed compelled, by the Law Court's holding in Dingwell.[5] Because there is no genuine issue of material fact and Barrett is entitled to judgment as a matter of law regarding Continental's duty to defend, I recommend that the Court deny Continental's motion for summary judgment and grant, in part, Barrett's motion for summary judgment.

**B.      Michigan Mutual's Duty to Defend**

It is sometimes said that a party attempting to prove the terms of a lost insurance policy must do so with clear and convincing evidence. There is some question, however, whether this heightened standard is justified in reason. See, e.g., Remington Arms Co. v. Liberty Mut. Ins. Co., 810 F. Supp. 1420, 1423 (D. Del. 1992) (criticizing the justifications given for the imposition of a heightened standard and applying a preponderance of the evidence standard); Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co., 210 F.3d 672, 688 (6th Cir. 2000)

---

[5]      I am, of course, aware that the underlying litigation had its own underlying administrative investigations that might, in theory, position this case somewhere between Dingwell and A. Johnson & Sons, but suffice it to say that the parties' summary judgment papers do not invite that kind of analysis. Nor am I inclined to think that such an analysis would prove fruitful for the defendants in light of the fact that the underlying complaint does not involve an administrative enforcement action by the Maine DEP or federal EPA.

(affirming lower court's determination that Ohio would adopt a preponderance standard and opining that that standard "makes practical sense [and] appears to represent the majority rule"). The Law Court has yet to address the issue. I believe that the Law Court would most likely impose a preponderance of the evidence standard in light of the reasoning in Lincoln Electric and Remington Arms, supra. In any event there is no dispute in this case about the terms of a lost policy, rather the dispute is whether there ever was any policy in effect prior to 1986.

Michigan Mutual asserts that any CGL policy Michigan Mutual would have issued to Barrett between 1983 and the end of 1985 would have conformed to the ISO standard form reflected in Exhibit W of the joint stipulation and would have afforded coverage for liability in "damages" arising from an occurrence that causes property damage, excluding damages caused by pollution, unless such pollution occurred during a sudden and accidental event. (Michigan Mutual's Mot. at 3.) Thus, assuming that Michigan Mutual issued a CGL policy to Barrett prior to 1986, there is no genuine issue of material fact for trial concerning that policy's terms. The terms are supplied by Exhibit W.

The question is whether the two internal memoranda produced by Barrett and the two Michigan Mutual loss forms, all of which predate 1986, coupled with Michigan Mutual's ongoing provision of insurance commencing in 1986, albeit subject to a total pollution exclusion, generate a genuine issue of material fact whether Michigan Mutual was insuring Barrett under a CGL policy in effect prior to 1986, when Michigan Mutual was using the CGL form represented by Exhibit W. Mr. Martino's affidavit describes these documents as being among Barrett's "business records" and indicates that he discovered them following his review of Barrett's business records. (Martino Aff. ¶ 2.) In the case chiefly relied upon by Michigan Mutual, the court observed that the contents of a lost policy can be proved indirectly with "secondary

evidence" such as "correspondence, financial statements, annual reports, certificates of insurance, and records of premium payments." MetLife, 224 F. Supp. 2d at 384.  The same court asserted, however, that "the mention of a policy number in another document is insufficient to establish . . . the existence . . . of insurance coverage." Id.  This proposition rested, in part, on the imposition of a clear and convincing standard of proof.  Id. (citing Boyce Thompson Inst. For Plant Research, Inc. v. Ins. Co. of N. Am., 751 F. Supp. 1137, 1140 (S.D.N.Y. 1990)).  As a consequence, MetLife  cannot be followed as persuasive authority in this case.

> Generally, the existence of a contract is a question of fact to be determined by the jury.  A contract exists if the parties mutually assent to be bound by all its material terms, the assent is either expressly or impliedly manifested in the contract, and the contract is sufficiently definite to enable the court to ascertain its exact meaning and fix exactly the legal liabilities of each party.

Sullivan v. Porter, 861 A.2d 625, 631 (Me. 2004).  In this case, neither Barrett nor Michigan Mutual have requested a jury trial on any claims.  Thus, it is up to this court to make the disputed factual findings concerning whether the policy existed.

Although the existence and terms of a lost insurance policy may be proved through secondary evidence, some courts have adopted a rule that the party that contends it was insured must demonstrate "that it has made a diligent but unsuccessful search and inquiry" for the missing policy documents.  Burt Rigid Box Inc. v. Travelers Prop. Cas. Corp., 302 F.3d 83, 91 (2d Cir. 2002) (internal quotation marks omitted).  This rule is premised on the so-called "best evidence" rule, id., which is found in Maine Rules of Evidence 1002 and 1004 and also in the Federal Rules of Evidence.  In any event, Michigan Mutual has not clearly raised a best evidence objection in opposition to Barrett's reliance on this business record evidence and it does not appear applicable to the present factual dispute involving simply whether or not the policy was ever issued.  The Law Court does not appear to have imposed a strict requirement that an affiant

speak to the "diligence" of his or her search before opening the door to secondary evidence. Rather, application of the best evidence rule turns on judicial discretion exercised in the context of the particular circumstances of the case at hand. Graybar Elec. Co. v. Sawyer, 485 A.2d 1384, 1387 (Me. 1985). Moreover, the purpose behind the best evidence rule is "to secure the most reliable information as to the contents of a document when its *terms* are disputed." State v. Navarro, 621 A.2d 408, 411 (Me. 1993) (emphasis added). The only dispute in this case is over the issuance of a form CGL policy, not its terms. Finally, it is implicit from Mr. Martino's affidavit that he has reviewed Barrett's "available business records" and that the exhibits produced in connection with the pending motions are what is available. The exhibits are not offered as secondary evidence of the terms of the policy; they are offered as circumstantial evidence of the policy's existence.

I conclude that Barrett's internal memoranda from 1983 and 1985 and its possession of Michigan Mutual CGL loss notice forms dated from 1985 are sufficiently probative of the existence of a CGL policy prior to 1986 to support a verdict in Barrett's favor concerning Michigan Mutual's duty to defend. Thus, Michigan Mutual is not entitled to summary judgment. In particular, the 1985 loss forms specifically identify policy number SR-32-0-72010-2, the same policy identified in the numerous endorsements issued by Michigan Mutual in 1987 and beyond. The associated memorandum tends to establish that these forms were being used by Barrett in the 1985 timeframe, which likewise tends to establish that Michigan Mutual insured Barrett in the 1985 timeframe under a policy drawn according to the Exhibit W form. But is this enough to warrant an affirmative summary judgment disposition for Barrett? In opposing Barrett's statements of fact, Michigan Mutual raised certain evidentiary objections but did not suggest that the documents in question are not authentic. The summary judgment papers do not suggest that

Mr. Martino was ever deposed or that his testimony about the documents being the only available business records might be subjected to a credibility challenge.  In effect, no dispute has been generated regarding these material facts; only a dispute over whether those facts are sufficient to support the requisite finding.  Arguably, under these circumstances there would be no reason for the court to hold an evidentiary hearing on the question of whether policy SR-32-0-72010-2 was in effect prior to 1986.  Based on its review of the documents attached to Barrett's statement of material facts, the Court will either conclude that Michigan Mutual more likely than not did insure Barrett with a CGL policy containing the terms found in Exhibit W in the 1985 timeframe or that Michigan Mutual more likely than not did not so insure Barrett.  Still, because the terms of the alleged insurance contract are supplied by Exhibit W, the Court might well hold a very narrow evidentiary hearing to consider the probative value of the documents on the limited question of whether a policy was in effect in 1985 since the Court, as the factfinder, must determine whether such an inference is warranted.[6]  If the Court should make such a finding, and if the Court agrees with my prior analysis of the application of the "sudden and accidental" exception to the pollution exclusion, an entry of judgment for Barrett and against Michigan Mutual would follow.[7]

Michigan Mutual makes one additional argument.  According to Michigan Mutual, a duty to defend could not arise from any policy it issued between 1983 and 1985, "to the extent the underlying . . . complaint seeks contribution for past and future costs associated with remediation

---

[6]    Because the terms of the alleged contract are not in dispute, there is no occasion for the Court to delve into factual issues relating to the parties' intentions in order to determine what terms they mutually agreed upon.  Compare Top of the Track Assocs. v. Lewiston Raceways, 654 A.2d 1293, 1296 (Me. 1995) (reversing entry of summary judgment where a genuine issue of fact existed "as to the intention of the parties relative to the continued operation of [a race]track for the duration of [a] lease").

[7]    If the policy was in effect in 1985, then, consistent with the general allegations of the underlying complaint, it might be proved that there was an occurrence of a "sudden and accidental" release of a pollutant from Barrett's facility in that year (prior to Michigan Mutual's adoption of a total pollution exclusion), which possibility would give rise to a duty to defend under the policy.

of alleged pollution" because such liabilities are not properly "damages," citing <u>Patrons Oxford</u>

<u>Mutual Insurance Company v. Marois</u>, 573 A.2d 16 (Me. 1990).  (Michigan Mutual's Mot. at 7.)

In <u>Marois</u> the Law Court held:

> that insurance contract language providing coverage for amounts the insured is
> 'legally obligated to pay as damages' does not cover expenses the insured incurs in
> meeting state clean-up demands [and] that the duty to defend the insured against
> 'any suit . . . seeking damages' does not include an administrative proceeding that
> can award no damages.

573 A.2d at 16.  As was the case in <u>Marois</u>, the language of the policy at issue "provides

coverage not for 'property damage' itself, but for 'sums which the insured shall become legally

obligated to *pay as damages* because of . . . property damage." <u>Id.</u> at 18.  However, unlike in

<u>Marois</u>, the underlying complaint presents an action by a private party to recover money, not to

impose injunctive relief.  Thus, the Law Court found it important to indicate that the underlying

state administrative action at issue in <u>Marois</u> could not lead to the recovery of damages by the

Maine DEP, but could only result in an order to conduct a clean-up.  <u>Id.</u> at 20.  Nor, observed the

Court, was the DEP suing for reimbursement.  <u>Id.</u>  Because neither of these circumstances were

presented in <u>Marois</u>, the Law Court concluded that "there has been no 'suit against the insured

seeking damages,' and the insurer has no present duty to defend." <u>Id.</u>  Unlike <u>Marois</u>, of course,

the underlying complaint in this action meets the distinguishing characteristics identified by the

Law Court in <u>Marois</u> insofar as it could lead to the recovery of damages or an order to reimburse

the plaintiff in the underlying action.  Accordingly, the fact that the insurance policy conditions

coverage on the existence of liability in "damages" does not preclude the imposition of a duty to

defend in this case.  I recommend that the Court deny Michigan Mutual's motion for summary

judgment and also deny, in part, Barrett's motion for summary judgment because the weight to

be given to Barrett's secondary evidence of the existence of a Michigan Mutual CGL policy

presents a question of fact.

**C.      First State's Duty to Defend**

According to First State, it is entitled to summary judgment against Barrett's declaratory

judgment and breach of contract claims for two reasons:

> [1]  Under the plain and unambiguous language of the excess insurance policies
> issued by First State to Barrett Paving—as interpreted by courts in Maine and
> throughout the country—First State has no duty to defend Barrett Paving against
> the allegations asserted in Citizens' Third Party Complaint.  As an excess insurer,
> First State has no defense obligation absent exhaustion of the limits underlying it's
> policies.  [2]  In addition, First State has no defense obligation because coverage
> for the claims alleged in the Third-Party Complaint is precluded by the pollution
> exclusion contained in First State's excess policies.

(First State's Mot. at 2, Docket No. 50.)  First State asserts that Maine law governs these

questions and Barrett does not oppose that assertion.  (First State's Mot. at 6 n.5.)

First State's first argument concerns the question of whether an excess/umbrella insurer

must "drop down" to assume the responsibilities of an insolvent primary insurer.  (Id. at 7.)  First

State quotes conditions in its policies that make the duty to defend contingent upon the

exhaustion of the limits of coverage extended under any underlying policies.  (Id. at 8-9.)  This

assertion is premised, primarily, on "Condition I" of first layer excess/umbrella policy number

943741 (covering the period between December 14, 1979, and February 15, 1981):

> I.  Underlying Insurance.  If underlying insurance applicable in any one
> OCCURRENCE is exhausted by payment of judgment or settlement on behalf of
> the INSURED, the COMPANY shall be obligated to assume charge of the
> settlement or defense of any claim or proceeding . . . but only where this policy
> applies immediately in excess of such underlying insurance, without the
> intervention of excess insurance of another insurer.

(Condition I, Ex. P at FS00020.)  As for the second excess/umbrella policy, number 928333

(covering the period between February 26, 1980, and February 15, 1981), First State asserts that

that policy contains no defense obligation  whatsoever and otherwise is consistent with the terms

of policy 943741.  (First State's Mot. at 10 n.6.)  Because it is stipulated that coverage under the

primary policy issued by the bankrupt Midland has not been exhausted, First State reasons that it

is entitled to judgment.  (First State's Mot. at 9.)

Barrett argues that certain language in First State's policy 943741 obligates First State to

pay Barrett's defense costs arising from the underlying complaint.  (Barrett's Mot. at 6-7.)

Specifically, Barrett points to a "Defense-Settlement" provision found at "Insuring Agreement"

IV of the policy:

> IV. DEFENSE-SETTLEMENT
> A.  With respect to any OCCURRENCE not covered, as warranted, by the
> underlying policies listed in Schedule A hereof, [8] whether collectible or not, or
> not covered by any other underlying insurance collectible by the INSURED but
> covered by the terms and conditions of this policy, except for the RETAINED
> LIMIT stated in item 3 I B of the Declarations, the Company shall:
>
> 1.  defend any suit against the insured alleging PERSONAL INJURY,
> PROPERTY DAMAGE or ADVERTISING INJURY or DAMAGE and seeking
> damages therefore, even if such suit is groundless, false or fraudulent; but the
> COMPANY may make such an investigation, negotiation or settlement of any
> claim or suit as it deems expedient. The INSURED shall promptly reimburse the
> COMPANY for any amount paid in the satisfaction of cases defended hereunder
> within the retained limit after making proper deduction for all recoveries and
> salvage collections, but excluding all loss, expense and legal expense.

(Insuring Agreement IV.A, Ex. P at FS 00017.)  According to Barrett, First State must "drop

down" because the policy plainly states, in Barrett's words, "that First State will defend any suit

against the insured alleging property damage with respect to any occurrence that is not covered

by any other underlying insurance collectible by the insured."  (Barrett's Mot. at 8-9.)  In making

this argument, Barrett focuses on First State's failure to specifically name Midland in Schedule A

of the policy, suggesting that this omission makes the Midland policy an "other" policy under

provision IV.A.  From that premise, Barrett reasons that because Midland is bankrupt, the

---

[8]     The policy fails to identify any underlying policies in a Schedule A, making this part of the provision
immaterial.

underlying policy issued by Midland is no longer collectible, triggering a duty to defend on the part of First State. (Id. at 9.)

First State argues that the first clause of provision IV.A controls this dispute as well as the more direct language of Subsection IV.B (First State's Mot. at 10-11), which provides:

> B.  When underlying insurance, whether or not listed in Schedule A, does apply to an OCCURRENCE, the COMPANY shall have no duty to pay defense, investigations, settlement or legal expenses covered by such underlying insurance; however, the COMPANY shall have the right and opportunity to associate with the INSURED and any underlying insurer in the defense and control of any claim or suit reasonably likely to involve the COMPANY under this policy.

(Insuring Agreement IV.B, Ex. P at FS 00017.)  In support of this position, First State cautions that courts are hesitant to construe excess insurance policies in ways that would, in essence, transform the excess insurer into a primary insurer.  (First State's Mot. at 13-17.)[9]

The parties have stipulated that First State's excess policies were all "umbrella" policies. "'Umbrella' policies differ from standard excess insurance policies in that they are designed to fill gaps in coverage both vertically (by providing excess coverage) and horizontally (by providing primary coverage).  In the latter instance, the Umbrella is said to 'drop down' to provide primary coverage where the underlying policy provides no coverage at all." Comm. Union Ins. Co. v. Walbrook Ins. Co., 41 F.3d 764, 767 n.4 (1st Cir. 1994).  See also Premcor USA, Inc. v. Am. Home Assur. Co., 400 F.3d 523, 525 (7th Cir. 2005) (describing the two functions of an umbrella policy).

> [T]he broader function served by umbrella policies [is to] extend[] coverage even to unanticipated "gaps." As one authority has explained, umbrella policies effectively shift away from the insured the burden of choosing the risks to which the insured remains exposed:

---

[9]      First State also maintains that a pollution exclusion contained in its excess policy precludes any finding that any of the claims in the underlying complaint could be covered by its policies.  (First State's Mot. at 18-20.)  The pollution exclusion found in the First State policies is the same as the exclusion set forth in the Continental policy discussed above and I therefore disregard that aspect of First State's motion for the reasons set forth in my discussion of Continental's motion.

> [an umbrella] arrangement contrasts with the method of providing
> Excess Liability insurance along traditional lines.  Under the
> excess approach, it is up to the insured . . . to choose those
> exposures against which excess protection is desired.  The obvious
> disadvantage lies in the possibility of a wrong guess about the
> critical exposures.  Under the Umbrella Liability contract, the
> principal guesswork is in the [underwriter's] rating [of the overall
> risk]. . . .

Comm. Union Ins. Co. v. Walbrook Ins. Co., 7 F.3d 1047, 1053 (1st Cir. 1993) (quoting F.C. &

S. Bulletins, "Companies and Coverages: Specialty Lines" at U-1 (December 1980)).  But see

Globe Indem. Co. v. Jordan, 634 A.2d 1279, 1284 (Me. 1993) (suggesting in *dicta* that umbrella

policies are like other excess policies in that they afford coverage only in circumstances where

primary coverage is exhausted, i.e., not where there are gaps in the primary coverage, but

addressing, in any event, a policy that was neither purely excess nor umbrella and also affirming

equitable apportionment of defense costs).

Of course, the primary determinant of an insurer's legal obligations under an insurance

contract must be the language of the contract itself.

> A duty to defend exists if a complaint reveals a potential that the facts ultimately
> proved may come within the coverage.  An insurance contract must be construed
> in accordance with the intention of the parties, which is to be ascertained from an
> examination of the whole instrument.  Further, all parts and clauses must be
> considered together so that it may be seen if and how one clause is explained,
> modified, limited or controlled by the others.

State Farm Mut. Auto. Ins. Co. v. Montagna, 874 A.2d 406, 408 (Me. 2005) (internal quotation

marks and citations omitted).  The primary objective is to "give reasonable effect to all terms

whenever possible."  Walbrook Ins. Co., 7 F.3d at 1052.  Although "[a]ny ambiguity in the

insurance policy language is resolved in favor of finding a duty to defend," Me. Mut. Fire Ins.

Co. v. Gervais, 745 A.2d 360, 363 (Me. 1999), a court need not strain to find ambiguity.  Langer

v. United States Fid. & Guar. Co., 552 A.2d 20, 22 (Me. 1988).

The Defense-Settlement provision of First State's policy provides that First State will afford a defense to Barrett for occurrences covered by the terms and conditions of First State's umbrella policy (1) when the occurrence at issue is not covered by a Schedule A underlying policy, "whether collectible or not" or (2) when the occurrence is "not covered by any other underlying insurance collectible by the insured." The question presented here is where the Midland policy falls. Was the Midland policy an underlying policy within the ambit of Schedule A or was it an "other" underlying policy?

Barrett argues that the Midland policy was not a Schedule A underlying policy because First State did not name Midland in Schedule A. (Pl.'s Mot. at 6; Pl.'s Opposition to First State's Mot. at 6.) I disagree that the failure to name Midland in Schedule A generates any ambiguity in the otherwise clear language of Insuring Agreement IV.A. Schedule A is First State's "Schedule of Underlying Policies." Under the heading "Policies," Schedule A reads:

> Comprehensive General Liability
>        Including:
> Personal Injury Liability
> Blanket Contractual
> Employee Benefits Liability
> Products
> Completed Operations
> Non-owned Watercraft
> Host Liquor Law Liability
> Blanket XCU
> Incidental Malpractice
> Employees as Additional Insureds
>
> Automobile Liability
>
> Employers' Liability

Barrett does not suggest that the Midland policy was anything other than a comprehensive general liability, or CGL, policy. Indeed, the parties' stipulation describes the Midland policy as *the* primary liability insurance coverage from December 14, 1979, to February 15, 1980. (Joint

Stip. ¶ 29.)  The parties also describe the Continental policy as "replacing" the Midland policy in February 1980.  (Id. ¶ 30.)  The underlying Continental policy is a CGL policy.  (Id. ¶ 31.)  In my view Schedule A adequately references the Midland policy, albeit not by name or policy number.[10]  This reading is the most natural reading because it harmonizes First State's broad references to entire categories of underlying policies in Schedule A with the language of Insuring Agreement IV.A and also corresponds with Insuring Agreement IV.B's broad denial of any duty to assume defense and related costs when any underlying coverage "applies."  Additionally, this reading makes First State's duty to defend correspond with the basic nature of an umbrella policy:  First State will defend when there is a gap in the underlying coverage identified in Schedule A, unless the insured has some other policy that affords coverage for the particular occurrence at issue that is collectible.

Based on my reading of the First State umbrella policy and Schedule A, the Midland policy is not an "other" policy and, therefore, the fact that it is not collectible is not material. Instead, the question of whether First State's duty to defend is triggered depends on whether or not the Midland policy extended coverage to the occurrence(s) alleged in the underlying complaint, "whether [that coverage is] collectible or not."  (Insuring Provision IV.A, Ex. P at FS00017.)  Because Barrett fails to make any presentation to support a finding that the Midland policy did not extend coverage to the occurrence(s) alleged in the underlying complaint, Barrett fails to establish that there is a genuine issue of material fact capable of preventing the entry of summary judgment in favor of First State.

---

[10]        I fail to understand how the Midland policy, i.e., the *primary* underlying liability policy, could be reasonably regarded as an "other" policy fa lling under the second category identified in Insuring Agreement IV.A.

D.      **Barrett's Motion for Summary Judgment**

Based on the foregoing analysis, I conclude that Barrett is entitled to judgment as a matter of law that Continental owes Barrett a duty to defend in connection with the underlying action and must reimburse Barrett for its defense costs to date.  However, I also conclude that First State is entitled to summary judgment against Barrett's claims and that the question of Michigan Mutual's duty to defend turns on a factual dispute that is not suited for a summary judgment disposition.

In addition to seeking summary judgment on the defendants' duty to defend, Barrett also asks for an award of attorneys' fees in connection with this action.  (Pl.'s Mot. at 17-18.)  "[A]n award of attorney fees to the insured is appropriate when it is clear from a comparison of the insurance policy and the complaint that the insurance company is potentially liable to indemnify the insured.  An award . . . is not appropriate if the law is unsettled with respect to a duty to defend a particular action or if the possibility that the insurance policy requires coverage is 'not something that is obvious on the face of the complaint.'"  Gervais, 745 A.2d at 363 (quoting Union Mut. Fire Ins. Co. v. Inhabitants of Town of Topsham, 441 A.2d 1012, 1019 (Me. 1982)). In my view, the proper resolution of the duty to defend question is clear based on the Law Court's opinion in Dingwell.  Accordingly, I recommend that the Court grant Barrett's summary judgment request for an award of the attorneys' fees incurred in connection with this action, but only against, at this time, Continental Insurance Company.

CONCLUSION

Based on the discussion set forth above, I **RECOMMEND** that the Court:

(1)      **DENY** the motion for summary judgment filed by Continental Insurance Company (Docket No. 49);

26

(2)      **DENY** the motion for summary judgment filed by Michigan Mutual

Insurance Company (Docket No. 54);

(3)      **GRANT** the motion for summary judgment filed by First State Insurance

Company (Docket No. 50); and

(4)      **GRANT** Barrett's motion for summary judgment (Docket No. 53) against

Continental Insurance Company, **DENY** it against First State Insurance

Company, and, finally, **DENY** it against Michigan Mutual Insurance

Company to the extent that the question of whether a policy was issued in

1985 remains a dispute of fact.

<u>NOTICE</u>

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

Dated:  November 7, 2005